# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-00458-SCT

*DAMON SAMHAL FAGAN a/k/a DAMON FAGAN*
*a/k/a DAMON S. FAGAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/21/2014 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| TRIAL COURT ATTORNEYS: | ANGEL MYERS |
| | KATHRYN VAN BUSKIRK |
| | ADRIANNE CRAWFORD |
| | MICHAEL CUNNINGHAM |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | PHILLIP W. BROADHEAD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/06/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., LAMAR AND KING, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     A jury convicted Damon Fagan of four counts of sexual battery, and the trial judge

sentenced him to thirty years in prison, with ten years' post-release supervision. Fagan

appeals to this Court, arguing that the State's evidence was legally insufficient and that his

conviction was against the overwhelming weight of the evidence. We disagree and affirm the trial court.

## FACTS AND PROCEDURAL HISTORY

¶2. In September 2012, Bryan Davis told police that Fagan had sexually abused his niece several years before. Fagan lived with Bryan's sister, Nakeia, "on and off" from around 2001 until around 2010. Nakeia had two daughters from a prior relationship,[1] and Bryan reported that Fagan had abused her younger daughter, K.D. After speaking with Bryan, Nakeia, K.D., K.D.'s siblings, and Fagan, the police arrested Fagan. He subsequently was indicted on four counts of sexual battery in violation of Mississippi Code Section 97-3-95(1)(d). The incidents as set forth in the indictment took place between August 2007 and August 2008. Fagan was tried on February 18-20, 2014, and the jury found him guilty.

¶3. At trial, the State presented five witnesses in its case-in-chief: the victim, K.D.; her uncle, Bryan Davis; her mother, Nakeia Davis; Assistant Superintendent Belinda Daymond;[2] and Investigator Kim Stevens. And because Fagan raises the sufficiency and weight of the evidence, we detail the testimony presented.

K.D.

¶4. K.D. testified that she was fifteen years old and attended Pascagoula High School. She has one older sister and one younger sister. She lived with her aunt and uncle (Bryan Davis) at the time of trial. K.D. testified that she was in the fourth grade the first time Fagan

---

[1]Nakeia and Fagan also had a child together during their relationship.

[2]Belinda Daymond was the Assistant Superintendent of Elementary Education for the Pascagoula School District, and she testified about K.D.'s school attendance records.

abused her. She was living in Moss Point and attending Creole Elementary, and she was "supposed to be getting a whipping for getting in trouble at school." But instead, Fagan "put his mouth on [her] vagina."[3]

¶5.     K.D. testified that she was going into the fifth grade at Beach Elementary and was living in Pascagoula the second time Fagan abused her. She testified that Fagan again put his mouth on her vagina. When these incidents occurred, her clothes would be "pulled down." K.D. was in the sixth grade at Trent Lott Academy the third time Fagan abused her, and the same thing occurred then.

¶6.     K.D. testified that her mother observed one of the incidents. K.D. stated that she was "laying on the bed and he — his mouth was on my vagina." Her mother "started cussing and [] told him to get out." Fagan left for a while, but he came back later that night. K.D. also testified that Fagan stuck his penis in her mouth once, but she did not remember during which incident that occurred. Fagan did not say anything to K.D. during the incidents, but he told her once that "if [she] told he would kill [her] and [her] family." K.D. identified Fagan as her abuser from the witness stand.

¶7.     K.D. testified that she told her mother about the abuse each time it occurred, but her mother said "nothing" to her about it. K.D. also testified that someone had told her to "pray about it."[4] K.D. testified that her uncle reported the incidents to law enforcement. Right

---

[3]When asked about the incidents more specifically by the State, K.D. testified that Fagan's mouth was on the "inside" of her vagina.

[4]It appears from Nakeia's testimony that both Nakeia and Fagan's mother told K.D. this.

before the report to police, her grandmother had "disowned" her and "sent a message out" to the family, because she thought K.D. might be a lesbian.

¶8. On cross-examination, K.D. reiterated that, around the time her uncle reported the allegations to the police, her grandmother had sent a text message to the family saying that she was "disowning" K.D., because K.D. had decided to become a lesbian. K.D. also testified that her relationship with her mother Nakeia was not good during that time, and that she "always talked back to [Nakeia]."

¶9. K.D. testified that she was not upset with Fagan for leaving them. She went to Fagan's house after the incidents and after he had moved out, but she only went because her little sister [Fagan's biological child] was over there—she did not go "voluntarily." She testified that she was not scared of Fagan.

Bryan Davis

¶10. Bryan Davis is Nakeia's brother and K.D.'s uncle. On September 4, 2012, Bryan received a call from his aunt, who had received a call from his mother. His mother had told his aunt in a voicemail that K.D. had been molested and that she knew who had done it. His aunt told him that she had received a "strange message" from his mother and that he might need to check it out. It was close to midnight, but Bryan got up and began getting dressed. He then received an "en masse" text message from his mother, stating that she "denounced [K.D.] because she wasn't sure of her sexuality." Bryan testified that that "further got [his] attention," and that he then left the house.

4

¶11. Bryan went to Nakeia's house, where his mother was staying. His mother was outside crying. He asked her about the message she had left for his aunt, and she said she "didn't want to let [him] know, she didn't want [him] to get upset." Bryan "insisted that she tell [him] who this person was," and she did. After he found out, Bryan left Nakeia's house, went back home and called police. He did not speak to Nakeia or K.D. while he was at Nakeia's house.

¶12. Bryan told police that Fagan had sexually abused K.D. He testified that K.D. was in DHS custody, but that he had been taking care of K.D. and her sisters since the investigation began.

### Nakeia Davis

¶13. Nakeia testified that K.D. was born on August 22, 1998. K.D. was three years old when Fagan came into their lives, and Fagan lived with them "off and on" until she was twelve.

¶14. Nakeia testified that she also had been charged in connection with the allegations that had been made against Fagan, with accessory after the fact to sexual battery and with hindering the prosecution in the first degree. She had pleaded guilty to both charges prior to Fagan's trial, but she had not been sentenced. Nakeia testified that the State was going to recommend five years' probation on those counts.

¶15. When the State asked Nakeia when she first learned that Fagan was abusing K.D., Nakeia responded:

A. She's [K.D.'s] told me about it but actually I found out when I walked in.
Q. That's when you knew for sure?

5

A. Yes.

Q. But she had told you about it before then?

A. Yes.

Q. Had she just told you once or had she told you about it a couple of times?

A. A couple of times.

Q. But you knew for sure when you walked in. What did you see?

A. I walked in, saw my daughter sitting on the bed leaning back a little and Damon Fagan knelt down in front of her with her legs open in a position that she shouldn't have been in.

Q. Did you recognize that as being something sexual in nature or something else?

A. Sexual in nature.

Nakeia testified that she was "really upset" and told Fagan that he needed to leave. She talked to Fagan's mother about what she saw, and his mother told her to "pray about it." Nakeia told K.D. to pray about it as well, as she had done the previous times when K.D. had come to her about the abuse. Nakeia talked to Fagan about what she saw, but he said "nothing happened," and she let him back in the house.

¶16. When Bryan reported the abuse to police, Nakeia denied the allegations at first. She told police that K.D. had "made it up," and she told them about "problems" she had been having with K.D. She sent K.D. over to Fagan's house with her younger sister sometimes; K.D. did not go of her own free will.

¶17. On cross, Nakeia reiterated that she did not believe K.D. initially when she told her about the abuse, but that she changed her mind when she "walked in on the – what I saw." She believed K.D. after observing the incident, but she still did not report it; instead, she went to Fagan's mother. She also continued to allow Fagan to be around her children.

¶18. Nakeia confirmed Bryan's testimony that, in September 2012, their mother sent out a mass text to everybody in the family disavowing K.D. for coming out as a lesbian. People

6

asked K.D. why she had decided that, and she said that Fagan's abuse had caused to her become a lesbian.

¶19. On redirect, Nakeia testified that she had spoken with police about her fear of Fagan during an interview. She said that Fagan "had a violent side to him," that they had "had altercations before," and that that was one of the reasons she had not told police. Nakeia also described the incident she witnessed more specifically—she stated that she walked into her oldest daughter's room, where she saw Fagan and K.D. They had clothes on, and K.D. was sitting on the bed. Fagan was kneeling down between K.D.'s legs, with his face close to "her private area." She stated that "[i]t didn't look right, what I saw." Nakeia responded affirmatively when the State asked her if "at that moment you knew that she had been telling you the truth?"

Detective Kim Stevens

¶20. Kim Stevens was a detective with the Pascagoula Police Department. On September 5, 2012, Bryan Davis filed a police report with the Pascagoula Police Department, and the case was assigned to Stevens. A forensic investigator interviewed K.D. Stevens spoke with Bryan, K.D., K.D.'s siblings, Nakeia and Fagan. She advised Fagan of his *Miranda* [5] rights, and he waived those rights. Fagan's interview lasted approximately an hour and a half.

¶21. Fagan "continued to deny the allegation[s]" in the beginning of the interview. He disclosed that he had been a victim of molestation himself. When asked to describe the interview as a whole, Stevens testified:

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

7

A. In the beginning of the interview he sat upright in his chair. Again, he continued to deny the allegations. As the interview went on, he slouched his head, he started to rub his face. By the end of the interview he was on his knees on the interview floor, sobbing, asking for leniency, asking for forgiveness and stating that his judgment was cloudy, said things had gone too far and that he made a mistake.

Q. During the interview, what admission did he make?

A. Mr. Fagan admitted to being in his step-daughter's bedroom. He admitted to being on his knees beside the bed as [K.D.] was on the bed. He admitted to his wife, Nakeia, entering that bedroom and after seeing what was happening shouting, screaming, and kicked him out of the home.

The video interview recording was admitted into evidence and played for the jury. A transcript of the video interview also was admitted into evidence.

¶22. After the interview video was played, the State asked Stevens to tell the jury what Fagan had said at the very end, because they had had an "issue with the video." Stevens testified: "I asked him if there was anything he wanted me to relay to [K.D.]. He said tell her I'm sorry, tell her I love her and tell her I made a mistake."

¶23. Stevens determined that the first incident took place at Eastwood in Moss Point. The second incident occurred in Dolphin South Apartments in Pascagoula. Stevens testified that K.D. said she was in the fourth grade during both incidents, and that she was ten years old. Stevens could not recall if K.D. ever alluded to anything about Trent Lott Academy.

¶24. Stevens testified that Fagan denied the sexual battery charges during his interview. When asked what Fagan did admit to during the interview, Stevens testified:

He admitted to being in his step-daughter's bedroom. He admitted to being on his knees as she lay — as she was on the bed. He admitted that his girlfriend, Nakeia, walked in on them, became upset, saw what they were doing and became upset and threw him out of the house. He admitted that his judgment was cloudy. He admitted things had gone too far. He admitted that he had made a mistake.

8

¶25. On cross, Stevens testified that Nakeia was cooperative during her interview and that she said she was "currently having a lot of behavior problems from [K.D.] and she did not know why [K.D.] was so angry with her." Stevens did not recall Nakeia ever calling [K.D.] a liar. But then when defense counsel asked Stevens to refer to her notes, Stevens read the following from her report:

> Approximately 1800 I contacted Nakeia Davis and asked her to come in for an interview. She agreed. Approximately 1900 she arrived. She refused to be booked into the jail and was disorderly. She was placed into a cell and not interviewed at that time. She continued to curse that her daughter [K.D.] was a liar and that she was doing this to get back at her. She demanded [K.D.] be removed from her house. That was on 9/12. That was the day prior to my interview with her.

On redirect, the State asked Stevens if "after conducting your interview with Nakeia the next day, did she confess to the crime," to which Stevens responded "she did."

¶26. The State rested after Stevens's testimony. Fagan then requested a directed verdict, which the trial court denied.

Fagan

¶27. Fagan took the stand in his own defense. Fagan was thirty-five years old at the time of trial. He met Nakeia in a club in Moss Point in 2001. She was a bartender, and he liked her because she was shy. They began dating, and he moved in with her about two years later. They never married, but they lived together on and off until around 2010.

¶28. Fagan testified that he did "all that [he] could do" around the house. He "went past the expectations of a man"; he cooked, cleaned, washed the dishes, took out the trash, cut the yard—whatever needed to be done. He was sometimes the sole caregiver for the girls,

9

because Nakeia was getting her GED. He got along with K.D.'s older sister, but K.D. was "more difficult." He would buy things for the girls, like Halloween costumes, clothes and sneakers.

¶29. He moved out prior to being charged with the sexual batteries. Nakeia and K.D. would come over to his house and take him and his new girlfriend to the store, or go pick his girlfriend up from work. The three girls came over "every now and then" to stay with him and sometimes spent the night. The week before he was arrested, the girls had come over to his house three times. When asked whether he ever admitted guilt, Fagan replied "[n]o, sir."

¶30. But when asked whether he did, in fact, commit sexual battery on K.D., Fagan replied:

> A. Not that – not that I know of, sir. I'm not – the amount of drugs I was on and medication, I really, you know – I'm not fixing to sit up here and deny that an incident may have mistakenly happened, but I know I ain't – because it never really – we took the girl to the hospital and everything after the incident was brought to my attention.
>
> Q. You took –
>
> A. Yes, we took [K.D.] to the hospital. It was nothing wrong with her. It was nothing said. So, I mean – after that it was let go. I talked to her and I even told her if I did something like that, that wasn't me. I was sorry or whatever, you know. I ain't – I was on drugs and stuff like that and I ain't even – if that happened. She said it wasn't nothing so I really wasn't – really I wasn't tripping to her. I harped on it for a long time because like I said in testimony, when I when I got kicked out that day I went to my mother's house and I slept if off and then I woke up and I talked to her about it. She told me about it and I said man, if I'm that type of person I would want to kill myself. I ain't – I don't want to hurt no child. To me, children is angels and I'm not that – I don't want to be that type person. It's not in me. I feel like I'm here to be a protector, which I've been doing all my life, sacrificed everything I got for them.

Q. As we sit her today, did you at any time willfully, unlawfully, feloniously commit sexual battery upon [K.D.]?

A. No. No, sir.

¶31. On cross, Fagan admitted that K.D. was sitting on the bed and that he was very close to her body, between her legs. Nakeia had told him that what she observed was sexual. Fagan did not know whether what Nakeia saw was "sexual or just inappropriate," because he was "basically the caregiver," and he had to "make sure the girls was cleaning they self right and everything else like that."

¶32. As a young child, K.D. would "cuss" at Fagan and "give [him] the finger." Fagan was not her father, and he "felt that vibe" from K.D. The State pointed out that Fagan had acknowledged in his statement that Nakeia had confronted him about the allegations before. Fagan said he did not "recall all that." Fagan admitted that he said he wished he could take it back, but he reiterated that he was on a lot of prescription drugs at the time. Fagan testified that he never threatened to kill K.D. Fagan stated that he "may have" made a mistake.

¶33. When asked by the State why he asked for a lesser charge during his interview, Fagan replied:

> A. My thing is this, like I was trying to say then, I was looking at the situation and I'm from New York where it's not down here and I'm just being honest with y'all, for a black man who has a background like mine be with drugs and this and that, its – the odds are stacked against him. This is the original birth place of slavery so it's not the same, ma'am. The ball game is completely the same. The whole set up is completely different.
>
> Q. So you'd just take a lesser charge?
>
> A. The preacher told me to cop out, I wasn't going to make it. I damn near had a heart attack because of that. I'm on record. It's a documented record at

11

the Singing River Hospital with me almost having a heart attack coming from that police station. I couldn't take that. I already knew what I was up against, so I mean that – just knowing that, it's scary for me.

Q. When [K.D.] talked about the abuse and she talks about what you did to her, she was telling the truth when she talks about that incident in the room, wasn't she? Because we have Nakeia who walked in either on the beginning or ending.

A. I mean, I plead no contest to that because I don't know – I can't honestly say I did . . . I ain't fixing to say I did.

¶34. On redirect, Fagan reiterated that he felt like he was "guilty until proven innocent" and that he did not stand a chance. He had made up his mind that he was going to jail regardless of the situation. So his attempt to lessen his charge was an attempt to "soften the blow." Fagan stated that K.D. had "always hung around lesbian girls," and that that did not go over "well at all" with the family. He talked with K.D. about it at one point, and her grandmother was not happy about her decision.

¶35. The defense rested after Fagan's testimony, and the State offered no rebuttal. After deliberation, the jury found Fagan guilty on all four counts of sexual battery. The judge sentenced Fagan to forty years in prison, with the last ten years to be served on post-release supervision. Fagan filed a Motion for Judgment Notwithstanding the Verdicts, or in the Alternative, a New Trial, which the trial judge denied. Fagan now appeals, arguing two points of error—that the State's evidence was insufficient, and that his conviction was contrary to the overwhelming weight of the evidence.

**DISCUSSION**

I.    **Fagan's convictions were supported by sufficient evidence**.

12

¶36. "[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005) (citations omitted). "However, this inquiry *does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'* Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" ***Id.*** (citations omitted) (emphasis added).

¶37. "[I]f a review of the evidence reveals that it is of such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." ***Id.*** (citations omitted).

¶38. Here, Fagan was charged with four counts of sexual battery, as set forth in Section 97-3-95(1)(d) of the Mississippi Code, which states: "(1) A person is guilty of sexual battery if he or she engages in sexual penetration with: (d) A child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child." Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2014).

¶39. We find that, from this record, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Bush***, 895 So. 2d at 843. K.D. testified clearly that Fagan had abused her at least four times. She testified that his mouth was on the "inside" of her vagina, and that he had partially inserted his penis into her mouth. The State presented evidence of both K.D.'s and Fagan's ages, and it is clear that Fagan was at least twenty-four months older. Nakeia testified that K.D. had told her about the abuse a couple of times and that she personally had observed an incident that was "sexual in nature." Nakeia admitted that she initially told the police that K.D. was lying, but she then told the jury about her two convictions for accessory after the fact and hindering the prosecution.

¶40. Stevens testified that Fagan had made several statements during his interview that could have been interpreted as inculpatory, such as he was sorry, he made a mistake, and things had gone too far. And even though Fagan denied the allegations a couple of times, he also stated that he did not commit sexual battery "that he knew of," and that he "plead no contest."

¶41. Fagan argues that "no rational trier of fact could have found each and every element of the offense that [he] sexually abused" K.D. for two main reasons. He argues first that K.D.'s testimony is weakened by (1) the time that elapsed between the alleged incidents and the time that they were reported to police, and (2) the situation surrounding the eventual report of the allegations, in which K.D. had reason to lie. In other words, K.D. fabricated the allegations in an effort to take the focus off herself when she told her family she was

questioning her sexuality. Fagan argues secondly that Nakeia's testimony was "impeached," rendering K.D.'s testimony uncorroborated. We reject both of these arguments.

¶42. First, as for Fagan's arguments regarding the strength of K.D.'s testimony, we note that K.D. (then nine years old) reported the abuse to her mother when it occurred (a fact that Nakeia confirmed). Fagan's argument about how much time elapsed before the police were contacted is therefore a red herring, as 2012 was *not* the first time that K.D. reported that she had been abused. That her family did not report the abuse to police until then was not K.D.'s fault and is not relevant to her credibility. As for the family situation surrounding Bryan's report to the police, all of that information was presented to the jury. And this Court repeatedly has stated that it is the jury's job to judge the credibility of witnesses. *See, e.g.*, *Watkins ex rel. Watkins v. Miss. Dep't of Human Servs.*, 132 So. 3d 1037, 1044 (Miss. 2014).

¶43. And second, Fagan asserts that "[d]ue to the fact that [Nakeia]'s testimony was impeached, the jury's basis for conviction was limited to [K.D.'s] uncorroborated testimony." We disagree. The jury heard testimony of Nakeia's initial denials to police and her later admissions of what she had been told by K.D. and what she personally had witnessed. As with all the witnesses, Nakeia's credibility was a question of fact for the jury to resolve.

¶44. In sum, we find that, viewing the evidence in the "light most favorable to the prosecution," a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## II. Fagan's convictions were not against the overwhelming weight of the evidence.

¶45. This Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would *sanction an unconscionable injustice*." *Bush*, 895 So. 2d at 844 (emphasis added). The evidence must be viewed in the light most favorable to the verdict, and the evidence must preponderate heavily against the verdict. *Cotton v. State*, 144 So. 3d 137, 142 (Miss. 2014).

¶46. Fagan repeats the same arguments that he made in his sufficiency-of-the-evidence argument to further his weight of the evidence argument. For the reasons stated in the sufficiency-of-the-evidence analysis, we do not find that Fagan's convictions were an "unconscionable injustice."

## CONCLUSION

¶47. Based on all of the testimony and evidence in this case, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt and that Fagan's convictions were not "so contrary to the overwhelming weight of the evidence that to allow them to stand would sanction an unconscionable injustice." We therefore affirm the judgment of the Jackson County Circuit Court.

¶48. **CONVICTION OF FOUR COUNTS OF SEXUAL BATTERY AND SENTENCE OF FORTY (40) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN (10) YEARS ON POST-RELEASE SUPERVISION, (THIRTY (30) YEARS TO SERVE), WITH CONDITIONS, AFFIRMED. SAID SENTENCES SHALL RUN CONCURRENTLY, TO BE SERVED DAY FOR DAY, WITHOUT EARLY RELEASE OR EARNED CREDIT. APPELLANT MUST REGISTER AS A SEX OFFENDER.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**