# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00074-SCT

*ARIOUS TURNER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/12/2022 |
| TRIAL JUDGE: | HON. LINDA F. COLEMAN |
| TRIAL COURT ATTORNEYS: | JAMIE MARIE BANKS |
| | ALISON LESLIE FLINT |
| | BRENDA FAY MITCHELL |
| | CHRIS POWELL |
| | JULIA GRAY STOWERS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| |     GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA BYRD |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/13/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.    Arious Turner was convicted of kidnapping her four-year-old daughter AT. In June 2019, the Bolivar County chancery court had awarded Turner's former step-mother, Sharetha Kimber, primary physical custody of AT. The chancellor granted Turner limited visitation rights consisting of two partial days a week. After the court-ordered visitation period expired

on September 21, 2020, Turner failed to return AT to Kimber, a lawful custodian. AT's whereabouts were unknown for forty-four days. United States Marshals finally located AT through the assistance of an informant in Greenwood, Mississippi.

¶2. The singular issue on appeal is whether the State presented sufficient evidence to convict Turner of kidnapping as set forth in Mississippi Code Section 97-3-53 (Rev. 2020). Viewing the evidence in the light most favorable to the State, a rational juror could reasonably find each element of kidnapping beyond a reasonable doubt based on the evidence presented. We affirm.

## FACTS & PROCEDURAL HISTORY

¶3. In 2012, Turner was in the custody of Revell Kimber, her step-father, after Turner's mother passed away. In October 2015, AT was born. Turner was seventeen years old at the time. She lived in Shelby, Mississippi, at Revell's residence with four other children. Three months after AT's birth, Turner and Revell had a falling out. Kimber, who was married to Revell from 2000 until 2009, was contacted by Mississippi Department of Health and Human Services (DHS)[1] to consider accepting physical custody of Turner and AT. Kimber agreed.

¶4. Kimber testified that after Turner turned eighteen years old, she had a confrontation with a social worker, ran away, and severed all communications with Kimber, AT, and CPS.[2]

---

[1]The Mississippi Department of Child Protection Services (CPS) was created as the state's child welfare agency in 2016. Before then, child welfare was under the jurisdiction of DHS.

[2]Describing this event, Kimber testified:

As usual, the social worker come visit the house. This particular time, [Turner] decide she didn't want to abide by the rules of . . . CPS, because she

One-year-old AT was placed in the primary physical custody of Kimber. Sometime thereafter, Turner returned and sought to regain custody of AT.

¶5. Several hearings ensued in the years that followed. Kimber maintained primary physical custody of AT throughout. In May 2019, the Bolivar County Chancery Court, Second Judicial District, held a hearing on Turner's petition for custody and/or visitation. On June 17, 2019, the chancery court entered a Temporary Order of Visitation. The order instructed that "the minor child, A.T., shall remain in primary physical custody of Respondent, Sharetha Kimber." The chancery court further determined that Turner would have visitation with AT "[e]very Sunday from 2:00 p.m. to 7:00 p.m. with visitation exchanges to take place at Ms. Kimber's home. Every Monday from 4:00 p.m. to 7:00 p.m. with visitation exchanges to take place at McDonald's." The chancery court ordered that "all visitations take place in the city limits of Cleveland, Mississippi." Lastly, the chancery court determined that "this matter is continued until an agreed upon date to allow Ms. Turner to inform the Court of (1) her status in taking the Barber's Licensing Exam and (2) her status in taking and passing her driver's test in order to receive a driver's license."

¶6. Kimber testified that on Mondays she would transport AT to the McDonald's parking lot in Cleveland to meet Turner. At the conclusion of Turner's allotted visitation time, she would return AT to Kimber in the same McDonald's parking lot.

is in custody. . . . [S]he didn't want to hear what the social worker have to say. She's 'gon leave. So, they asked her to stand outside and let me and the social worker discuss what her placement be, if she leave. But if she stay, or they're going to place her someplace else, her and the baby — we open the door. Called. Try to contact her to come back. She did not come back. So, the judge . . . gave me custody of [AT].

¶7.     On Monday, September 21, 2020, Kimber brought AT to the McDonald's parking lot, as she had done for more than a year. Later, Kimber drove back around 6:30 p.m., as was her custom. When Turner failed to return with AT at the appointed time, as she was prone to do, Kimber waited an additional fifteen minutes before attempting to call Turner. Kimber's attempts to call Turner were going directly to voicemail. After several more attempts, Kimber filed a missing child complaint with the Bolivar County Sheriff's Office (BCSO).

¶8.     Three days later, Kimber provided Investigator Joe Smith of the BCSO with custody papers and the Temporary Order of Visitation. Smith and Kimber went through a list of numbers together, seeking to contact Turner. Two days later, the chancery court granted Smith and Kimber permission to seek out Turner at her last known address in Coahoma County. When they arrived, Turner's landlord informed them that Turner had moved out the day before.

¶9.     Numerous attempts by other local law enforcement officers failed to locate Turner and AT. On October 26, 2020, the BCSO requested Inspector McClendon of the United States Marshals Service to assist in locating and arresting Turner on a charge of kidnapping. Initially, all attempts were unsuccessful. Then, in November, McClendon received a tip from an unidentified person who had knowledge of Turner's whereabouts.

¶10.    McClendon obtained the address of an apartment in Greenwood, Mississippi, in Leflore County. Upon arrival, the marshals confirmed that Turner and AT were present

inside the residence. The marshals summoned Turner to the front door and placed her under arrest.

¶11. AT was secured by CPS. A Leflore County sheriff's deputy transported Turner to officers waiting at the county line of Leflore County and Bolivar County. The marshals informed Kimber of Turner's arrest and advised Kimber that AT was at CPS's office in Greenville, where AT and Kimber were reunited. Kimber, who had lawful custody of AT, had not seen or heard from AT for forty-four days.

¶12. Turner was indicted for felony kidnapping under Mississippi Code Section 97-3-53. Turner was tried in the Circuit Court of Bolivar County, Second Judicial District. Turner sought a directed verdict after the State rested its case-in-chief. The trial judge denied Turner's motion. The trial judge placed Turner under oath outside the presence of the jury and explained her Fifth Amendment rights. Turner chose not to testify. After deliberation, the jury returned a guilty verdict: "[w]e, the jury, find the defendant guilty of kidnapping." The jury was polled, and each affirmed the verdict.

¶13. The law provides that "upon conviction [the defendant] shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict. If the jury fails to agree . . . the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections." Miss. Code Ann. § 97-3-53 (Rev. 2020). In this bifurcated proceeding, the jury was asked to consider punishment.

5

¶14. The State called Kimber. When asked by the State to express to the jury her feelings regarding a life imprisonment sentence, Kimber answered, "I don't recommend life, but I feel she should get some kind of punishment for what she did, but not life."

¶15. Turner took the stand during the sentencing phase. Of note, when defense counsel asked Turner, "[y]ou took [AT] to Greenwood, and you didn't answer any of the phone calls that came in to you, did you," Turner replied, "[n]o, I did not." Moreover, when asked, "[i]n Greenwood, the truth of the matter was, you were hiding. You didn't want to be found. You didn't want [AT] to go back, did you," Turner answered, "[n]o, I did not want [AT] to go back." The jury retired to consider the sentence. Upon return, the jury informed the trial judge that "[w]e, the jury, are unable to unanimously agree to fix the Defendant's punishment at life imprisonment in the State penitentiary."

¶16. The trial judge sentenced Turner to a term of one year in the custody of the Mississippi Department of Corrections, suspended Turner's incarceration, and reduced her sentence to one (1) year of nonreporting probation. Turner filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, which were denied. Turner appeals her conviction, contending that the State failed to present sufficient evidence to sustain the jury's guilty verdict.

**STANDARD OF REVIEW**

¶17. This Court reviews whether the evidence is sufficient to sustain a conviction de novo. *Green v. State*, 269 So. 3d 75, 79 (Miss. 2018) (citing *Brooks v. State*, 203 So. 3d 1134, 1137 (Miss. 2016)). In reviewing whether the evidence is sufficient to sustain a verdict, we

view the evidence in the light most favorable to the State. *Swanagan v. State*, 229 So. 3d 698, 703 (Miss. 2017) (quoting *Fagan v. State*, 171 So. 3d 496, 503 (Miss. 2013)). In doing so, we determine whether the State presented evidence sufficient on each element of the charge so that a rational juror could find all of the essential elements of the offense beyond a reasonable doubt. *Id.* (quoting *Fagan*, 171 So. 3d at 503).

¶18. Regarding statutory challenges, we reiterate that "[i]f the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." *Miss. Dep't of Revenue v. SBC Telecom, Inc.*, 306 So. 3d 648, 652 (Miss. 2020) (internal quotation marks omitted) (quoting *Vicksburg Healthcare, LLC v. Miss. State Dep't of Health*, 292 So. 3d 223, 226 (Miss. 2020)).

## DISCUSSION

¶19. Mississippi Code Section 97-3-53 reads:

> Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, or without lawful authority shall forcibly seize, inveigle or kidnap any vulnerable person as defined in Section 43-47-5 or any child under the age of sixteen (16) years against the will of the parents or guardian or person having the lawful custody of the child, upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict. If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections.

Miss. Code Ann. § 97-3-53 (Rev. 2020).

¶20. Turner contends that the legislature did not *intend* for Section 97-3-53 to apply to her because she is AT's natural parent. Turner argues that the State failed to prove the elements

7

of kidnapping, as her actions were not contemplated by Section 97-3-53. Turner cites Mississippi Code Section 97-3-51, an offense not included in her indictment, as the controlling statute. Section 97-3-51 reads *in part* that "[i]t shall be unlawful for any noncustodial parent or relative with intent to violate a court order awarding custody of a child to another to remove the child from this state or to hold the child out of state after the entry of a court order." Miss. Code Ann. § 97-3-51(2) (Rev. 2020). Turner contends that the offense set forth in Section 97-3-51(2) implies that the legislature did not intend for natural parents in custody battles to be charged under Section 97-3-53 and that she did not take AT out of state.

¶21. Turner's argument fails to address subsection (4) of Section 97-3-51. It reads verbatim that "[t]he provisions of this section shall not be construed to repeal, modify or amend any other criminal statute of this state." Miss. Code Ann. § 97-3-51(4) (Rev. 2020). The unambiguous language in Section 97-3-51(4) offers no support to Turner.

¶22. Furthermore, for more than one hundred years this Court has recognized that when a court decree denies a natural parent custody, the natural parent may be criminally liable for kidnapping their own child. *State v. Powe*, 107 Miss. 770, 66 So. 207 (1914). There, the Court cited cases from New Hampshire and Kansas courts, which found that

> The question for decision here is whether the father can be held criminally liable on the charge of kidnapping his own child . . . . It was decided in the case of *State v. Farrar*, 41 N.H. 53 [(1860)], that a father could be held on the charge of kidnapping his own child where he took it from the lawful custody of its mother . . . in that case the custody of the child was assigned to the mother by decree of court, and it was said that the father, by force of the decree, had lost his right over the child. In the case of *In re Peck*, 66 Kan, 693, 72 Pac. 265 [(1903)], it was held that both parents were guilty of

8

> kidnapping their children, where they were taken from their grandmother, to whom their custody had been awarded by the court in a habeas corpus proceeding. The grandmother was held the person having lawful charge of the children, even against the parents.

*Powe*, 66 So. at 207. This Court agreed, holding that Mississippi will uphold a conviction for kidnapping when a solemn decree of a court of competent jurisdiction has taken the custody of a child from one parent and awarding custody to another individual. *Id.* at 208.

¶23. Additionally, like this Court in *Powe*, the Supreme Court of Missouri has representatively found that "the rule is established throughout the United States that where the father and mother are equally entitled to the custody of their minor child the father does not commit the crime of kidnapping by taking exclusive possession of it," but also like this Court in *Powe*, it representatively held that "[w]here the custody has been established by the decree of a competent court or by statute, the rule is otherwise." *State v. Huhn*, 346 Mo. 695, 700, 142 S.W.2d 1064 (1940) (citations omitted).

¶24. The Temporary Order of Visitation that granted primary physical custody of AT to Kimber was introduced without objection as State's Exhibit 1. That order limited Turner's *visitation* rights to eight specific hours a week—five on Sundays and three on Mondays. Specified times required AT's return to Kimber. The order also specified that all visitations were to take place in Cleveland. Whenever Turner chose to ignore and violate those established times and geographical limitations, she possessed AT without lawful authority. Viewing the evidence in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Turner's decision to not return AT was without legal authority.

9

¶25. Undisputed evidence supported that (1) AT was four years old when Turner failed to return her to the lawful custody of Kimber and (2) that Kimber had the right of lawful custody of AT during the forty-four days when AT's whereabouts were unknown. Turner submits that she did not take AT against AT's will. Turner's plea ignores that the victim of the offense under the charge of kidnapping, as set forth in Turner's indictment, is Kimber, i.e., the person who possessed lawful custody of the child.

¶26. Evidence was presented that Turner kidnapped AT against Kimber's will. Kimber testified that on September 21, 2020, she brought AT to Turner at the McDonald's parking lot, and Turner never returned. Turner had severed all communication with Kimber. After an extended wait, Kimber filed a missing child report with the BCSO. Kimber later petitioned the chancery court for permission to look for Turner and AT in Coahoma County. Kimber worked with a BCSO to search the last known address of Turner. Turner was not found at her regular address. The assistance of the United States Marshals Service was ultimately utilized to locate the missing toddler but not until forty-four days had passed since Kimber was left sitting alone in the McDonald's parking lot. Turner never sought permission or provided any information on AT's whereabouts or well-being throughout the forty-four days. Kimber testified that had she known Turner would not return AT, she would not have allowed AT to leave with Turner. Kimber testified that she did not approve of Turner's hiding AT after the visitation period expired. Viewing the evidence in the light most favorable to the State, a rational juror could reasonably infer beyond a reasonable doubt that Turner kidnapped AT against Kimber's will.

10

## CONCLUSION

¶27. Because a rational juror could have found each essential element of kidnapping beyond a reasonable doubt, we affirm Turner's conviction and sentence.

¶28. **AFFIRMED.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**