# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00893-SCT

*TERRANCE WATTS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/13/2023 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| TRIAL COURT ATTORNEYS: | KEVIN DALE CAMP |
| | JODY EDWARD OWENS, II |
| | JAMES KURT GUTHRIE |
| | SHAUNTÉ DENISE WASHINGTON |
| | ESEOSA GWENDLINE AGHO |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/20/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND ISHEE, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. In October 2020, a grand jury for the First Judicial District of Hinds County indicted Terrance Watts for the first degree murder of his half brother Yancy Williams pursuant to Mississippi Code Section 97-3-19(1)(a) (Supp. 2017). In July 2023, Watts stood trial and was convicted of first degree murder. The trial judge sentenced him to serve a term of life

imprisonment. Watts raises three issues on appeal. First, whether the evidence was sufficient to support a guilty verdict for first degree murder, or, in the alternative, whether the verdict was contrary to the overwhelming weight of the evidence. Second, whether jury instruction S-4 on deliberate design killing, which was given without objection, was improper as a matter of law. Lastly, whether jury instruction S-2, informing that malice aforethought could be inferred from the use of a deadly weapon, was an improper comment on the weight of the evidence. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Shortly after midnight on March 23, 2020, Crime Scene Investigator Andrew Harris of the Jackson Police Department (JPD) was dispatched to a shooting at a Marathon gas station on Hanging Moss Road. Harris photographed the scene and collected evidence. Several of Harris's photographs depicted a deceased male lying on the ground with a gunshot wound to his head. Harris photographed and collected one spent shell casing with a 9 mm Luger marking next to the deceased. Harris photographed the driver's license of the deceased individual, which revealed that his name was Yancy Williams and that he was a firefighter for the Jackson Fire Department (JFD). Harris also photographed several surveillance cameras positioned around the exterior and interior of the Marathon.

¶3. Harris was subsequently dispatched to photograph a recovered black Chevrolet Tahoe that had been identified by the surveillance footage as involved in the shooting. After obtaining a warrant to search the inside of the vehicle, Harris photographed and collected one live round with a 9 mm Luger marking on the driver side floorboard.

2

¶4.     Also dispatched to the Marathon was Kevin McNeal, who was a detective with JPD at the time.  McNeal obtained the surveillance footage from the Marathon.  These video recordings were played in front of the jury.  McNeal also spoke with the firemen who responded to the shooting and was informed that Williams had visited Jackson Fire Station Number 20 on March 22, 2023, with a man named Terrance, later identified as Terrance Watts.

¶5.     The exterior surveillance footage of the Marathon revealed that the Tahoe parked at a gas pump around 11:30 p.m.  The interior surveillance footage revealed that Williams and Watts were similar in height and weight, Williams being slightly taller and bulkier than Watts.  Each video revealed that Williams was visibly very intoxicated.

¶6.     The surveillance footage revealed Williams and Watts talking to each other in front of the entrance after exiting the store.  Williams handed Watts some cash, and Watts re-entered the store with Williams following behind.  After the two had exited the store for the second time, the exterior surveillance footage showed Williams bumping into Watts in the gas station parking lot.  Watts said something, and Williams's behavior became more animated.  Watts pulled out some cash from his pocket and dropped it on the ground.  Williams squared up to Watts, but Watts walked back toward the Tahoe.  Williams started to chirp at Watts.  Watts turned back around.  For the next several minutes, the two wrestled each other in the parking lot before Watts broke away and re-entered the driver side door of the Tahoe.

¶7.    Williams attempted to pump gas while Watts sat in the driver's seat.  As the two spoke, Watts got out of the vehicle and in Williams's face.  Watts re-entered the Tahoe, and Williams turned facing the gas pump.  Watts then stood on the running board of the Tahoe and shot Williams once in the head with a hand gun while Williams stood at the pump. Watts drove away immediately thereafter.

¶8.    Around 8:00 a.m., Watts turned himself in at the Flora Police Department.  Watts agreed to be interviewed by McNeal.  During the video and audio recording of the interview, Watts recounted that he had just met Williams after finding out they were half brothers. Williams had met up with Watts on March 22, 2020, to get to know each other.  According to Watts, Williams had a gallon of corn whiskey in his vehicle.  Williams let Watts drive his vehicle throughout their time together that day.

¶9.    The two visited the fire station where Williams worked.  According to Watts, Williams was acting in an aggressive manner and hurt one of the other firemen there, Michael Stinson.  Watts also stated that another JFD fireman, David Friday, warned him that Williams could be dangerous when he drank and that Williams had choked him on a prior occasion.  After leaving the fire station, Watts drove Williams to a party in Flora, Mississippi.  After returning to Jackson following the party, Watts pulled into the Marathon gas station on Hanging Moss Road.

¶10.   Watts informed McNeal that Williams became aggressive in the parking lot when Watts informed him that he did not have any money to help pay for gas.  According to Watts, Williams thought he was lying and would not let him enter the Tahoe for fifteen minutes.

According to Watts, he began to grow nervous that the gas station clerk would call the police and was concerned because he knew there were outstanding warrants for his arrest.

¶11. Watts informed McNeal that Williams owned the hand gun that he used in the shooting and that Williams showed him its location in the center console in case they needed it for protection later. According to Watts, he knew that Williams just wanted to fight and was concerned that the police would get called, but Williams would not listen and continued to act aggressively. Watts told McNeal that "I know he probably just wanted to fight I should have just fought but I panicked and I just shot him."

¶12. Watts informed McNeal that he did not see Williams with any weapons. Watts also denied that he felt threatened by Williams and stated his belief that Williams meant no harm. Watts repeated to McNeal that Williams was probably just mad that he did not have any gas money, and "I think he probably just wanted to fight or something so I should have just fought him." Watts informed McNeal that after he drove away from the gas station, he threw the hand gun into some bushes on Beasley Road and put the keys to the Tahoe in a trash can down the street from his friend's house. Law enforcement never recovered the gun or keys.

¶13. Michael Stinson was a fireman at JFD with Williams. He recounted seeing Williams twice on March 22, 2020. The first time when Williams brought Watts to Fire Station Number 20, Stinson recalled wrestling around with Williams and related that they would wrestle almost every shift. The second time Stinson saw Williams that day, Williams was deceased at the Marathon. Stinson was part of the rescue unit that responded to the shooting. Stinson identified the deceased body as Williams. Stinson informed law enforcement

officers at the scene that Williams was at the fire station earlier that day and that the last person he saw him with was Watts. Stinson related that Watts's statement that Williams hurt his arm while wrestling was a lie; according to Stinson, Williams had never hurt him. Stinson considered Williams to be like a brother.

¶14. Watts also mentioned in his interview that JFD fireman David Friday, who was a long-time friend of Watts, had warned Watts to be careful around Williams. Friday testified that he did not recall telling Watts to be careful around Williams because he had never seen Williams behave in an aggressive manner.

¶15. Dr. Mark LeVaughn was employed by the Mississippi Department of Public Safety at the State Medical Examiner's Office as an associate state medical examiner. LeVaughn completed an autopsy report regarding Williams's death. LeVaughn's report listed Williams's height as 5'5" and his weight as 166 pounds. Also included in LeVaughn's report was a toxicology report revealing that the amount of alcohol in Williams's blood was 0.199 percent.

¶16. Watts moved for a directed verdict after the prosecution rested its case-in-chief, contending that the prosecution failed to present proof of malice. The trial judge denied the motion. The jury found Watts guilty of first degree murder. The trial judge sentenced Watts to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. Watts filed a post-trial motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial judge denied that motion as well. Watts raised three issues on appeal. Finding no error, we affirm.

6

**I    Whether the evidence was sufficient to support a verdict for first degree murder, or, in the alternative, whether the verdict was against the overwhelming weight of the evidence.**

¶17.    The Court reviews whether the evidence is sufficient to sustain a conviction de novo. *Green v. State*, 269 So. 3d 75, 79 (Miss. 2018) (citing *Brooks v. State*, 203 So. 3d 1134, 1137 (Miss. 2016)).  In reviewing whether the evidence is sufficient to sustain a verdict, we view the evidence in the light most favorable to the prosecution. *Swanagan v. State*, 229 So. 3d 698, 703 (Miss. 2017) (quoting *Fagan v. State*, 171 So. 3d 496, 503 (Miss. 2015)).  In doing so, we determine whether the evidence presented was sufficient for a rational juror to find each essential element of the crime beyond a reasonable doubt. *Id.* (quoting *Fagan*, 171 So. 3d at 503).

¶18.    We review a trial judge's decision to deny a motion for new trial for an abuse of discretion. *Owens v. State*, 383 So. 3d 305, 309 (Miss. 2024) (citing *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017)).  In carrying out our review, "we weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Little*, 233 So. 3d at 292 (Miss. 2017) (alteration in original) (internal quotation marks omitted) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)).

¶19.    Watts contends that the prosecution proved only manslaughter rather than first degree murder, arguing that Williams's aggressive behavior at the Marathon provoked Watts to impulsively grab Williams's pistol and shoot him.  Under Mississippi Code Section 97-3-

19(1)(a) (Supp. 2017), "[t]he killing of a human being without the authority of law by any means or in any manner shall be murder . . . [and] [w]hen done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder . . . ."

¶20.    "It has long been the case law of this state that malice aforethought, premeditated design, and deliberate design all mean the same thing." *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992) (quoting *Johnson v. State*, 475 So. 2d 1136, 1139 (Miss. 1985)). "The term 'deliberate' means 'a full awareness of what one is doing and generally implies careful and unhurried consideration of the consequences.'" *Abeyta v. State*, 137 So. 3d 305, 312 (Miss. 2014) (quoting *Wilson v. State*, 936 So. 2d 357, 364 (Miss. 2007)). "The term 'design' 'means to calculate, plan or contemplate.'" *Id.* (quoting *Wilson*, 936 So. 2d at 364). Deliberate design "may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Holliman v. State*, 178 So. 3d 689, 698 (Miss. 2015) (internal quotation mark omitted) (quoting *Jones v. State*, 154 So. 3d 872, 880 (Miss. 2014)). As a matter of law, deliberate design "may be inferred through the intentional use of any instrument[,] which based on its manner of use, is calculated to produce death or serious bodily injury." *Id.* (internal quotation mark omitted) (quoting *Childs v. State*, 133 So. 3d 348, 352 (Miss. 2013)).

¶21.    There is no doubt based on the surveillance footage that Watts and Williams were engaged in a physical altercation in the Marathon parking lot, i.e., wrestling, pushing, and

shoving. Williams was clearly the instigator of the tussling. The law, however, does not sanction the authority to kill in response to horse play.

¶22. The surveillance footage showed that Williams was not in any physical altercation with Watts, wrestling or otherwise, when the shooting occurred. Watts informed McNeal during his interview that he did not see Williams with any weapons nor had Williams threatened him. According to Watts, Williams meant no harm, and Watts admitted that he probably just wanted to wrestle.

¶23. It was uncontested that Watts intentionally shot Williams with a deadly weapon. Watts never asserted that the shooting was accidental. The video of Watts's interview with McNeal revealed that Watts knew Williams had a pistol in the center console. Evidence was presented of one live round of Luger 9 mm ammunition recovered from the driver side floorboard of the Tahoe.

¶24. A reasonable juror could infer based on common sense and lived experience that Watts formed a plan to kill Williams when he retrieved Williams's pistol from the center console, pulled back the slide, and ejected one live round onto the floorboard. The jury reasonably could have found that Watts's actions revealed that he, being previously unfamiliar with Williams's pistol, was unsure whether the hand gun had a bullet in the chamber. The jury reasonably could have found that once Watts ejected the live round, he then had confirmation that the pistol was ready to fire. Accordingly, the jury reasonably could have found that Watts was fully aware of what he was doing when he exited the Tahoe and intentionally shot Williams in the head. Viewing the evidence in the light most favorable

9

to the prosecution, therefore, any rational juror could have found each element of first degree murder beyond a reasonable doubt.

¶25. Moreover, Watts contends in the alternative that because evidence of malice aforethought was lacking, his conviction of first degree murder was contrary to overwhelming weight of the evidence. As discussed above, ample evidence was presented showing malice aforethought in support of the jury's verdict. Watts told McNeal that Williams meant him no harm and that he did not feel threatened. Watts was in no physical altercation, wrestling or otherwise, when he shot Williams. The evidence provided a reasonable inference that Watts ejected the live round to confirm Williams's pistol was indeed ready to fire. Accordingly, the jury's guilty verdict for first degree murder was not against the overwhelming weight of the evidence.

**II     Whether Watts was prejudiced by the trial judge's decision to grant jury instruction S-4.**

¶26. Instruction S-4 was given without objection. It read:

The Court instructs the jury that deliberate design as it is used in these instructions means an intent to kill without authority of law and not being legally justifiable or legally excusable. Deliberate always indicates full awareness of what one is doing and generally implies careful and unhurried consideration of the consequences. Design means to calculate, plan or contemplate. Deliberate design to kill a person may be formed very quickly and perhaps only moments before the act of killing the person. However, a deliberate design cannot be formed at the very moment of the fatal act.

¶27. "This Court reviews the grant or denial of proposed jury instructions for an abuse of discretion." *Quinn v. State*, 191 So. 3d 1227, 1231-32 (Miss. 2016) (citing *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012)). Because Watts did not object to the instruction when it

10

was proposed, this issue is procedurally barred. *See **Spiers v. State***, 361 So. 3d 643, 654 (Miss. 2023). Because the issue was not preserved, we apply a plain error analysis. *Id.* at 657. "To determine if plain error has occurred, this Court must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether that error has prejudiced the outcome of the trial.'" ***Conner v. State***, 138 So. 3d 143, 151 (Miss. 2014) (alteration in original) (internal quotation marks omitted) (quoting ***Grayer v. State***, 120 So. 3d 964, 969 (Miss. 2013)).

¶28. Watts contends that, although instruction S-4 contained an accurate statement of the law, he was irreparably prejudiced by the deliberate design instruction as the jury was also instructed on the lesser included crime of manslaughter. This Court has held that "instructing the jury that a deliberate design can arise *at the instant of the killing* conflicts with a heat of passion excusable homicide instruction and is reversible error." ***Fears v. State***, 779 So. 2d 1125, 1128 (Miss. 2000) (emphasis added) (citing ***Cooley v. State***, 346 So. 2d 912, 914 (Miss. 1977)).

¶29. Notwithstanding the procedural bar, Watts's contention lacks merit. In the case sub judice, S-4 unambiguously instructed that deliberate design to kill "may be formed very quickly, and perhaps only moments *before* the act of killing the person" and specifically stated that "a 'deliberate design' *cannot be formed at the very moment of the fatal act*." (Emphasis added.) The plain words of instruction S-4 negated the possibility of the jury finding anything other than first degree murder.

¶30. Alternatively, Watts contends that his trial counsel was ineffective for failure to properly object to the instruction. "In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial." *Holly v. State*, 716 So. 2d 979, 989 (Miss. 1998) (citing *Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Even assuming arguendo that trial counsel's performance was somehow deficient for not objecting to the proposed instruction, we cannot conclude that Watts was deprived of a fair trial.

### III Whether jury instruction S-2 improperly commented on the weight of the evidence.

¶31. Watts objected to proposed jury instruction S-2, which read that "[i]f death is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, then malice or the intent to kill may be inferred from the use of the weapon." Watts contends that, in the context of a manslaughter or self-defense claim, S-2 operated as a peremptory instruction, unfairly nudging the jury to find malice—an essential element of first degree murder.

¶32. The Court's longstanding principle when reviewing a trial judge's decision to grant or deny a proposed jury instruction is that if the instructions, when read together, (1) fairly announce the law of the case and (2) create no injustice, then no reversible error will be found. *Stewart v. State*, 378 So. 3d 379, 388 (Miss. 2024) (quoting *Montgomery v. State*, 253 So. 3d 305, 316 (Miss. 2018)); *see also Rayburn v. State*, 312 So. 2d 454, 456 (Miss. 1975). Moreover, "this Court has held that instructions which emphasize any particular part

of the testimony in such a manner as to amount to a comment on the weight of that evidence are improper." *Sanders v. State*, 586 So. 2d 792, 796 (Miss. 1991) (citing *Duckworth v. State*, 477 So. 2d 935, 938 (Miss. 1985)).

¶33. Watts's contention is misguided. It has been a longstanding principle of this Court that

> [t]he law does presume malice from the killing of a human being with a deadly weapon . . . unless facts are introduced in evidence changing the character of the killing and showing either justification or necessity . . . unless the facts in evidence explain the character of the killing, then this presumption still stands, and the State is entitled to an instruction announcing this legal principle.

*Hendrieth v. State*, 230 So. 2d 217, 219 (Miss 1970) (quoting *Dickins v. State*, 208 Miss. 69, 93, 43 So. 2d 366 (1949)). As in *Hendrieth*, here, no evidence was presented tending to show either legal justification or necessity for the shooting.

¶34. Moreover, this Court has repeatedly rejected the same argument as to whether the challenge instruction commented on the weight of the evidence. *See Gunn v. State*, 374 So. 3d 1206, 1210 (Miss. 2023). In *Gunn*, the Court found that, "[u]ndeniably, Gunn possessed and used a deadly weapon resulting in the death of Smith[,]" therefore, "[w]e fail to see how the jury instruction commented on the weight of the evidence or singled out a particular piece of evidence absent any analysis from Gunn, especially when read in conjunction with the rest of the jury instructions." *Id.*

¶35. Moreover, the Court ultimately held that

> [T]his Court has affirmed the use of similar jury instructions in *Williams* [*v. State*, 111 So. 3d 620, 625-26 (Miss. 2022)], and has repeatedly held that deliberate design may be inferred from the intentional use of a deadly weapon. *See Holliman* [*v. State*, 178 So. 3d 689, 698 (Miss. 2015)]; *Anderson v. State*,

13

79 So. 3d 501, 507 (Miss. 2012); *Carter v. State*, 722 So. 2d 1258, 1263 (Miss. 1998). The language of Mississippi's Model Jury Instruction reads: "[i]f you find that the defendant intentionally used a deadly weapon to either kill or cause great bodily injury to another person, then you may conclude from [his/her] act that the defendant acted with malice." Miss. Jud. Coll., Mississippi Plain Language Model Jury Instructions (Criminal) § 211, Westlaw (database updated Oct. 2023) (emphasis added). The language of this model jury instruction is nearly identical to the language used in the present case.

*Id.*

¶36. The same is true in today's case. Watts did not testify. His statements were contained in a video recording that was put in evidence by the prosecution. Those statements did not change the character of the killing by showing either justification or necessity. Additionally, this Court has repeatedly upheld instructions nearly identical to the instruction that Watts contends commented on the weight of the evidence. Watts's contention, therefore, lacks merit.

## CONCLUSION

¶37. Occurrences of fratricide are nearly as old as humanity itself. The factual details of today's case unfortunately add another example to this ancient litany. Finding no error, we affirm.

¶38. **AFFIRMED.**

**KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**

14