# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00369-SCT

*WILLIE JAMES HOLMES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/10/2000 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE E. AGNEW |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/25/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/15/2001 |

**BEFORE McRAE, P.J., COBB AND DIAZ, JJ.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. Willie James Holmes was indicted on the charges of conspiracy to commit murder and murder less than capital of Larry Donnell Simmons. He was convicted by a jury of both charges and sentenced to twenty years imprisonment for the charge of conspiracy to commit murder and sentenced to life imprisonment for the charge of murder less than capital. The sentences are to run concurrently. Holmes subsequently filed a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, which was denied by the circuit court. Feeling aggrieved, Holmes appeals citing the following issues:

> **I. WHETHER HOLMES'S MOTION TO SET ASIDE THE VERDICT OR FOR A NEW TRIAL SHOULD HAVE BEEN GRANTED BECAUSE THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

## FACTS

¶2. Larry Simmons was shot and killed on August 21, 1996, between the hours of 4 p.m. and 5 p.m. The shooting took place in an alley off of Ridgeway Street in Jackson. There were several people in that neighborhood who either saw or heard what occurred and who testified at trial. Most of the witnesses knew the victim, Simmons, and the defendants, Willie Holmes and Kenneth Brown. The facts leading up to and following the shooting are disputed among the various witnesses and defendants.

¶3. Holmes gave three statements to the police and testified at trial as to what occurred that afternoon. Each of his renditions differs. In his first statement, which he gave voluntarily the night of the shooting, Holmes stated that on the afternoon of the shooting, he went to Patrick Gowdy's house which is located

near the alley where the shooting occurred. There, Holmes met Brown and Gowdy. They told him that Larry Simmons had broken into Gowdy's house and stolen a television and radio system. Gowdy then asked Holmes and Brown if they had a gun for sale or knew of anyone with a gun for sale. Holmes claims that as they talked, Brown saw Simmons in the alley and told Holmes and Gowdy. Holmes then went into the alley and talked to Simmons. As Holmes was talking to Simmons in the alley, Gowdy "came off his back porch and started shooting." Holmes stated that, at that point, he ran down Ridgeway Street, saw his aunt and left with her. Also in his first statement, Holmes claimed that he, Brown and Gowdy had not discussed harming Simmons.

¶4. Two days after the shooting, Holmes was arrested and gave a second statement to the police. In that statement, Holmes added that Brown gave Gowdy his gun, and they went inside while Holmes talked to Simmons in the alley. He also added that he gave the gun he was carrying that night to his uncle after he ran away and that he saw Simmons's body on the ground as he was running away.

¶5. In a third statement, Holmes once again changed his story claiming that when he got to Gowdy's house that afternoon, there were three people there, Gowdy, Brown and "Big Willie." Gowdy told them he wanted to "teach Bam [Simmons] a lesson" and he was going to shoot Simmons in the leg. Holmes added that Gowdy shot Simmons as Simmons ran down the alley and he could see blood on the back of Simmons's white t-shirt as he ran. Holmes stated that he then pulled his gun out and ran down Ridgeway Street. While running, he heard more gunshots. Holmes then turned and saw Simmons lying in the alley and Brown and Gowdy standing by him, Gowdy still holding the gun. Holmes then alleged that he ran back to Gowdy's house and saw Gowdy get into his car and drive away. In this third statement, Holmes admitted that he knew Gowdy was planning to shoot Simmons, but he thought it would just be in the leg.

¶6. At trial, Holmes testified that his first statement was coerced by the officers who took the statement. He testified that he saw Gowdy shoot Simmons and that he did not remove his gun from his pocket that afternoon. At trial, he also denied that he told the police, in his second statement, that Gowdy told him he was going to "teach Simmons a lesson."

¶7. Holmes's co-defendant, Kenneth Brown, also gave two statements to the police. In his first statement, Brown claimed that he went to Gowdy's house that afternoon after he discovered that Simmons had stolen items from Gowdy's house through a hole in the wall connecting Gowdy's duplex to a vacant duplex. Brown then went into Gowdy's house and showed Gowdy his gun, and Gowdy asked him if he had a gun for sale. Brown went back outside where he met Holmes. According to Brown, Holmes was also drawn to Gowdy's house to see the notorious hole in the wall. According to Brown, it was Holmes who spotted Simmons in the alley and informed Gowdy and Brown of Simmons's presence.

¶8. In his second statement, Brown added that Gowdy wanted a gun so he could "take care of his business" and "shoot Bam [Simmons] in the leg." Brown also admitted that he knew Gowdy was going to shoot Simmons and that he saw Gowdy shoot his gun five or six times. In this statement, Brown also added that he saw Holmes put his gun in his pocket after the shooting, then walk around "all startled like."

¶9. At trial, Brown changed his story slightly, testifying that he took Gowdy to a man's house to buy a gun at about eight o'clock the morning of the shooting. Later he saw neighbors of Gowdy, Barbara and Octavia Perdue, who told him about Simmons breaking into Gowdy's house. Brown testified that Gowdy called Brown over to his house and told him what had been stolen from his house. Brown also added that after the shooting, Gowdy walked away, and Brown and Holmes told Barbara and Octavia to call the police. Like

Holmes, Brown also testified that the previous statement he gave the police was false and he only signed it so he could leave the police station.

¶10. Felechia and Delesia Gordon testified at trial that they were sitting on a relative's front porch very near Gowdy's house on the evening of the shooting. They knew all the parties involved because they had all grown up together in "the neighborhood." They saw Simmons and spoke with him briefly. Simmons then walked down the alley towards the back of the house, which is the front of Gowdy's house. Delesia heard Simmons arguing with someone, heard shots, then saw Holmes and Brown run to the front of the house saying "Did you get that nigger?" Felechia and Delesia testified that both Brown and Holmes were holding their gun in the air. Delesia then saw Gowdy drive away in a car.

¶11. Felechia testified that she looked behind the house when she heard arguing and saw that it was Gowdy and Simmons. She heard them arguing about the burglary of Gowdy's house. She also testified that she heard shots fired from two different locations.

¶12. Simmons's brother, Christopher Simmons, testified that shortly after he arrived home from work, he heard gunshots fired in the neighborhood. Soon after he heard the gunfire, Christopher Simmons was told that his brother had been shot, and he started off in that direction. On his way down Ridgeway Street, he saw Holmes running away with a gun in his hand and acting paranoid. When he arrived at the scene of the shooting, he saw his brother lying face down in the street. He did not see Gowdy or Brown. However, he was told by one of the Gordon sisters that "they [Gowdy, Holmes, and Brown] shot your brother."

¶13. Another of Gowdy's neighbors, Zinder Jefferson, was working on his car in his yard the afternoon of the shooting. He testified that he heard Gowdy's door slam, then two gunshots. He looked over the fence separating their yards and saw Gowdy fire his gun. He then called 911. When he returned to the yard, he saw Gowdy drive away in his car. Jefferson did not speak with the police that night, but continued working on his car.

¶14. Barbara and Octavia Perdue, neighbors of Gowdy, were sitting on their porch when the shooting occurred. Both sisters testified that they first saw Simmons walking through the alley, then saw Gowdy run out of his house. They also testified that, after the shooting, Holmes and Brown advised them to call 911 and that they did not see Holmes or Brown with a gun that night. Octavia testified that she saw Gowdy chasing Simmons, while firing his gun and she saw Gowdy drive away.

## DISCUSSION

### I. WHETHER HOLMES'S MOTION TO SET ASIDE THE VERDICT OR FOR A NEW TRIAL SHOULD HAVE BEEN GRANTED BECAUSE THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶15. Holmes argues that the circuit court erred in denying his motion for new trial because the evidence presented by his co-defendant, Kenneth Brown, cannot support the verdict and because Holmes did not knowingly enter into a common plan to kill Simmons. In its brief, the State responds to this argument by contending that Holmes is procedurally barred from making this argument on appeal.

¶16. As in *Collier v. State*, 711 So.2d 458, 461 (Miss. 1998), Holmes's discussion of the above assignment of error implicates both an argument concerning the legal sufficiency of the evidence and an argument that the verdict was against the overwhelming weight of the evidence. Questions of whether the

verdict is against the overwhelming weight of the evidence are raised when a motion for new trial is made. Questions of the legal sufficiency of the evidence are raised when a motion for a directed verdict is made. As such, this Court has stated that these arguments represent motions that "are separate and distinct and perform different offices within our criminal procedural system...." *Id.* (citing *May v. State,* 460 So.2d 778, 780 (Miss.1985). Holmes's contention that the verdict of the jury was contrary to the overwhelming weight of the evidence was not assigned as a ground for new trial in the lower court, and it may not be raised here for the first time. A trial judge cannot be put in error on a matter which was not presented to him for decision. *Ponder v. State*, 335 So.2d 885, 886 (Miss. 1976), citing *Cooper v. Lawson*, 264 So.2d 890 (Miss.1972); *Mercier v. Davis*, 234 So.2d 902 (Miss.1970); *Carpenter v. Savage*, 93 Miss. 233, 46 So. 537 (1908).

¶17. While Holmes does not raise the issue of whether the verdict was against the overwhelming weight of the evidence in his motion for new trial, he does contend that the circuit court erred in denying his motion for directed verdict arguing that "the prosecution failed to prove that Defendant was conspiring with or murdered Simmons, beyond a reasonable doubt. . . ." Therefore, we will discuss the legal sufficiency of the evidence supporting the verdict.

¶18. Sufficiency questions are raised in motions for directed verdict and also in JNOV motions. *McClain v. State*, 625 So.2d 774, 778 (Miss.1993). Where a defendant moves for a JNOV or a directed verdict, the trial court considers all of the credible evidence consistent with the defendant's guilt, giving the prosecution the benefit of all favorable inferences that may be reasonably drawn from this evidence. *Id*. This Court is authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence is such that reasonable and fair-minded jurors could not find the accused guilty. *Wetz v. State*, 503 So.2d 803, 808 (Miss.1987).

### A. The Conspiracy to Commit Murder Charge

¶19. Holmes was convicted of murder and conspiracy to commit murder. A conspiracy is a combination of two or more persons agreeing to accomplish an unlawful purpose, or agreeing to accomplish a lawful purpose unlawfully. *Clayton v. State*, 582 So.2d 1019, 1021 (Miss. 1991)(citing Miss. Code Ann. § 97-1-1). The act of any conspirator is the act of all of the conspirators. *Norman v. State*, 381 So.2d 1024, 1029 (Miss. 1980)(citing *Riley v. State*, 208 Miss. 336, 44 So.2d 455 (1950)).

¶20. Holmes contends that there is no evidence that he ever consented to a plan to kill Simmons. He claims that he was simply at the wrong place at the wrong time. The State argues that, from the evidence presented, a reasonable juror could have found that (1) Holmes went to Gowdy's house armed with a 9mm handgun; (2) Kenneth Brown was there and also armed with a 9mm handgun; (3) Gowdy's house had allegedly been burglarized by Simmons and Gowdy was looking for a gun; (4) Holmes saw Simmons and announced that fact to Gowdy and Brown; (5) Gowdy and Brown then went inside the house while Holmes stood outside and talked to Simmons, knowing Gowdy and Brown were going to come out and shoot Simmons; (6) after the shooting, at least two witnesses saw Holmes and Brown, with their weapons drawn, asking each other, "Did you get him? Did you get that nigger?"

¶21. We find that reasonable jurors could find Holmes guilty of conspiracy to commit murder. There were conflicting statements and testimony from Holmes and Brown about the above listed facts, but it was for the jury to weigh the credibility of the testimony and statements. *Jones v. State*, 381 So.2d 983, 989 (Miss. 1990).

*B. The Murder Charge*

¶22. Holmes also argues that the evidence is insufficient to support the jury's verdict that he is guilty of murdering Simmons. Holmes was indicted and convicted of murder under Miss. Code Ann. § 97-3-19 (2000), which, in part, provides:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>
> (a) When done with deliberate design to effect the death of the person killed, or of any human being;
>
> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual.

¶23. As previously stated, we must give the prosecution the benefit of all favorable inferences which may be drawn from the evidence. *McClain*, 625 So. 2d at 778.

¶24. Holmes asserts that the jury based its verdict not on the testimony from witnesses who said that Gowdy committed the shooting and not Holmes, but on the multiple inconsistent statements of Holmes and his co-defendant, Kenneth Brown.

¶25. In response, the State again argues that the inconsistencies in Holmes's and Brown's statements, which were taken soon after the shooting, and their testimony at trial (three and a half years after the shooting), were to be determined by the jury and not the judge.

¶26. Continuing the State's aforementioned "list" of evidence, reasonable jurors could have found that (7) Holmes and Brown were seen by the Gordon sisters holding their guns in the air; (8) Holmes ran down an alley with the intent to head off Simmons as he was trying to get away; (9) Holmes was seen, by Christopher Simmons, running down Ridgeway Street with a gun in his hand; and (10) Holmes left Simmons in the alley, dying, then hid his gun.

¶27. The State is correct in its assertion that Holmes's and Brown's admissions and confessions to law enforcement, Holmes's and Brown's contradictory testimony at trial, and the testimony from other witnesses, were sufficient to support Holmes's convictions of conspiracy to commit murder and murder less than capital.

## <u>CONCLUSION</u>

¶28. We affirm the trial court's denial of Holmes's motion for new trial because there was sufficient evidence for reasonable jurors to find Holmes guilty of conspiracy to commit murder and murder less than capital. The judgment of the Hinds County Circuit Court is affirmed.

¶29. **COUNT I: CONVICTION OF CONSPIRACY TO COMMIT MURDER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCES SHALL RUN CONCURRENTLY.**

**BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB AND EASLEY, JJ., CONCUR. PITTMAN, C.J., NOT PARTICIPATING.**