# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-01124-SCT

*JAYME LYNN TUBBS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/15/2023 |
| TRIAL JUDGE: | HON. LINDA F. COLEMAN |
| TRIAL COURT ATTORNEYS: | MICHAEL STEPHEN CARR |
| | AZKI SHAH |
| | CHRIS POWELL |
| | ALISON LESLIE FLINT |
| | JULIA GRAY STOWERS |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | TAMARRA AKIEA BOWIE |
| ATTORNEY FOR APPELLEE: | DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/01/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., CHAMBERLIN AND BRANNING, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. In 2022, Jayme Lynn Tubbs was indicted by a Quitman County Grand Jury along with codefendant Keith Coleman Jr. for two counts of conspiring to commit the murder of April Jones and Will Polk, two counts of first degree murder, and two counts of desecration of a human corpse. Tubbs and Coleman were tried jointly. After the State rested its case-in-chief, Coleman moved for a directed verdict, which Tubbs joined. The trial judge granted

the defendants' motions as to the two counts of conspiracy and dismissed those charges. The jury found Tubbs and Coleman guilty on all other counts.

¶2. Tubbs moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial judge denied her motion. After Tubbs had perfected her appeal, the trial court granted Coleman's request for a new trial based on a discovery violation. Tubbs moved to stay her appeal and remand the case to the trial court, contending that she was also affected by the discovery violation. The Court of Appeals granted her request for the limited purpose of conducting an evidentiary hearing on the alleged violation. *See* Order, ***Tubbs v. State***, No. 2023-TS-00191-COA (Miss. Ct. App. May 2, 2023); *see also* Order, ***Tubbs v. State***, No. 2023-TS-00191-COA (Miss. Ct. App. Aug. 23, 2023). At the evidentiary hearing, the trial judge found that a ***Brady***[1] violation had occurred and remanded Tubbs to the custody of the Quitman County Sheriff to await a new trial.

¶3. In September 2023, Tubbs and Coleman received their new trial on two counts of first degree murder of Jones and Polk under Mississippi Code Section 97-3-19(1)(a) (Supp. 2019), as well as two counts of desecration of a human corpse under Mississippi Code Section 97-29-25(2)(a) (Rev. 2014). The jury found Tubbs and Coleman guilty on all counts. The trial judge sentenced Tubbs to serve a term of life imprisonment as to the two counts of first degree murder, running consecutively. In addition, the trial judge sentenced Tubbs to a term of three years as to the two counts of desecration of a human corpse, running concurrently

---

[1] ***Brady v. Maryland***, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

with her two life sentences. Tubbs moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied her motion.

¶4. Tubbs raises two issues: (1) whether the evidence was sufficient to convict her of two counts of first degree murder, and (2) whether Chief Deputy Peter Clinton's testimony as to Tubbs's confession was inadmissible hearsay. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶5. In 2019, Keith Coleman Jr. was a local drug dealer in Quitman County, Mississippi. Coleman resided on Butler Road in Lambert, Mississippi. Chelsea Golden also resided at the Butler Road house, as well as Cierra Wheeler, who predominantly stayed with Coleman and Golden during that time. Both Golden and Wheeler had children living with them at the Butler Road house, each fathered by Coleman.

¶6. Coleman also resided part time at Dexter Ellis's house in Crowder, Mississippi, where he operated his illicit business to be closer to his clientele. According to Coleman, April Jones dated Ellis at that time and resided at the Crowder house. Subsequently, Jones began a romantic relationship with Will Polk, who would regularly hang out at the Crowder house. Rachel Russell, another one of Coleman's girlfriends, had a room at the Crowder house. Jayme Lynn Tubbs was a frequent visitor of the Crowder house, exchanging with Coleman sexual favors for methamphetamine.

¶7. On October 19, 2019, family members of Jones and Polk filed a missing person report at the Quitman County Sheriff's Office. Several law enforcement agencies helped

3

investigate, but the facts of Jones's and Polk's disappearance went unsolved for nearly a year and a half.

¶8.     In the meantime, Chief Deputy Clinton, a former Mississippi Bureau of Investigation (MBI) agent, began working for the Quitman County Sheriff's Department in February 2021. Part of his duties included clearing out lingering cases. While Clinton went through the jail list to garner each inmate's status, he met Coleman, who was in the county's jail at that time for unrelated crimes.

¶9.     Law enforcement had few leads as to the disappearance of Jones and Polk up to that time. In May 2021, Clinton interviewed a potential suspect at the jail. Coleman heard that his name came up during the interview in connection with the case. Coleman then escaped from the jail. He was apprehended in Craighead, Arkansas, shortly thereafter. During the transport back to Mississippi, Coleman asked to speak with Clinton.

¶10.    Clinton interviewed Coleman in the Panola County Sheriff's Office on May 28, 2021.[2] During this initial interview, Coleman related to Clinton that he was present when Jones and Polk were killed and that he would take Clinton to the location. The following day, Clinton and another investigator for the Quitman County Sheriff's Office, Darryl Linzy, had Coleman show them where Jones and Polk were killed. Coleman provided Clinton with a hand drawn diagram revealing the location. Coleman had the officers stop the vehicle when they

_____

[2]Both Coleman and Tubbs gave video recorded interviews with Clinton in this case. All parties possessed these recordings. None of the parties sought to introduce the recordings as substantive or impeachment evidence. The only objection Tubbs raised to Clinton's testimony regarding the statements in her interview was to a portion of his testimony during redirect examination that Tubbs contended went outside the scope of the cross-examination.

approached a large agriculture field off Butler Road. Coleman described a drug deal gone wrong—that supposed drug dealers shot and killed Jones and Polk, then forced Coleman to cut up the bodies at gun point.

¶11. Coleman's story was suspicious to the officers. They left the agriculture field and drove back toward Coleman's house on Butler Road. After a short distance, Coleman was permitted to exit the vehicle and walk down a gravel road. When he approached two fallen trees, Coleman called out, "[h]ey, this is the location where they was killed—I mean, where the body was burned up in the woodlines." Clinton took Coleman back to the jail while other officers searched for remains.

¶12. When the two arrived back to the jail, Clinton was informed that a human skull, hands, and a ring had been recovered. DNA from the skull was later compared with a swab taken from Polk's mother and revealed that "[t]he tooth's DNA profile is approximately 42 thousand times more likely, if Amanda Smith is his mother, as opposed to a randomly selected person in the population." Polk's mother also confirmed that the recovered ring belonged to the victim.

¶13. Coleman then gave a second interview to Clinton. Coleman related that in early October 2019, his drug stash, allegedly $18,000 worth of methamphetamine, as well as his guns, had been stolen from the Crowder house. Clinton testified that "according to him, Mr. Coleman, he alleged that April and Will stole his drugs and his guns, because he used to give them drugs. . . . But now . . . they are no longer asking him for drugs, but they're still getting high."

5

¶14.    According to Clinton, during Tubbs's later interview, "[she] also confirmed this . . . that she was part of this planning process, in which they agreed to pick up April and Will from Katie Mae's house." Specifically, according to Coleman, "[t]he plan was to get April off to herself and beat her up and let her know, you can't steal from me." Coleman needed Tubbs's help because "[Jones] knew [Coleman] was looking for her."

¶15.    Jones had started staying with Katie Mae after the burglary, whose house was next door to the Crowder house. According to Coleman, whenever he would knock on Katie Mae's door to speak with Jones, she would inform him that Jones was not there. According to Coleman, therefore, "[t]he plan was; [Tubbs] would use Rachel's car to go pick up April and take her off to herself. Meet up with me. I would beat her up and just leave her out there."

¶16.    While Coleman sought revenge for the loss of his methamphetamine, Tubbs had different motivations. According to Tubbs, she and Jones were best friends until Jones slept with her boyfriend, Dustin Smith. Tubbs was also upset at Jones for allegedly "snitching" to the police on an unrelated matter, but Clinton was unable to confirm this accusation. According to Clinton, at the end of Tubbs's interview, she admitted that during the planning, she knew that there was a possibility Jones could die, but she did not care.

¶17.    It was Tubbs's role to pick up Jones in Russell's vehicle under the guise of going to Taco Bell. Jones felt uneasy because she asserted to Tubbs, "don't start no shit." Jones acquiesced after Polk agreed to accompany her. Tubbs related that Polk would not allow her

6

to take Jones without him. According to the accounts of both Coleman and Tubbs, Polk's death that night was collateral to the ultimate goal of getting Jones to the ambush site.

¶18. While Tubbs performed her part, Coleman was back at the Butler Road house setting up the ambush. According to Golden, Coleman informed her that he was going to kill Jones and directed her to come with him. When Golden refused, Coleman aimed a pistol at their four-year-old son, Keith Coleman III, and threatened to kill the child if she disobeyed.

¶19. According to Golden, it was around 11:00 p.m. when she drove Coleman out to the agriculture field off Butler Road. Coleman had her stop the car. Both Jones and Polk knew Golden. As part of the plan, Coleman popped the hood of the vehicle to stage it as a decoy, appearing like Golden had broken down in the field. Tubbs would then act the part of the Good Samaritan, pulling off into the field to help.

¶20. At the same time, Tubbs was in contact with Coleman via text message as to not alert Jones or Polk that she was driving them to an ambush. After receiving a message while in the field, Coleman told Golden, "[t]hey [on] the way, but they got Will with them. Just make sure he don't do nothing." Coleman then went into the woods to hide while Golden stood next to the car. Golden testified that she did not run away because she knew that Coleman was watching from the woods with a gun.

¶21. Tubbs approached the decoy vehicle with Jones, Polk, and another individual in the passenger seat, Dezimond Green, whose involvement was adjudicated in a separate proceeding. She then parked Russell's vehicle next to Golden's. Tubbs exited the vehicle along with Polk to help Golden. Jones still sat in the car. Coleman then came out of the

7

woods, dragged Jones out of the car, and began to beat her with his pistol. Tubbs handed Golden a .22 caliber rifle that Coleman had brought with him in Golden's vehicle and cocked it for her, instructing Golden to hold the rifle on Polk in case he tried anything. Golden refused and kept the rifle pointed at the ground.

¶22. Jones tried to run as Coleman shot at her. According to Golden, "he started shooting. I don't know how many times. And she walked into the field, and then he shot and she fell." Polk then stopped running around scene and put his hands over his head, pleading to Coleman that he would not say anything. Coleman responded, "I know" and shot Polk in the chest.

¶23. After the murders, Coleman rendezvoused with Tubbs, Russell, and Green at the Crowder house. The four then checked into a motel. Coleman and Tubbs next went to Walmart to purchase items to dispose of the bodies. Tubbs confirmed that they purchased machetes, shoes, masks, some kerosene, and a blue tarp. According to Coleman, he and Tubbs went back to the Butler Road house where they dismembered the bodies—chopping off the heads and hands of Jones and Polk. According to Clinton, Tubbs wore a mask while disposing of the bodies "because she feared that out where they killed them at and chopped them up that they had Deer Cameras."

¶24. Tubbs had formerly been in a romantic relationship with Polk. Regarding Jones, Tubbs found dismembering her body funny and laughed while she did it. According to Clinton, "I asked her something to the effect that 'I have got to talk to the family members, and what do you think I aught to tell them?' She said something to the effect that . . . she'll

8

do it again. She deserved it, 'cause she was a snitch.'" But as to Polk, Tubbs stated that she really loved him "and that she didn't want to participate in cutting him up."

¶25. According to Tubbs, she and Coleman next burned what remained of the bodies. Tubbs confirmed that she and Coleman then put the victims' clothes into bags, and Coleman later gave them to another one of his girlfriends Cierra Wheeler to burn at a local campground. Wheeler confirmed that, as she received instruction from Coleman, "[h]e laid his phone on top of the trunk and told me to flip it over. And when I flipped it over, it was a picture of a body." Moreover, Golden testified that she later watched Coleman throw a backpack containing Jones's head and hands into a large slough behind the Butler Road house.

¶26. After the State rested its case-in-chief, Tubbs moved for a directed verdict. The trial judge denied her motion.

¶27. Coleman took the stand in his defense. Coleman confirmed that he suspected Jones of stealing his stash of methamphetamine and that he "formulated a punishment for that suspect." Coleman's trial testimony diverged considerably from his previous statements regarding what had transpired in the field. Coleman testified that while he was beating Jones, Golden, without any forewarning, shot Polk multiple times, and according to Coleman, when he went to check on Polk, he heard Golden fire four or five more shots and observed that Golden had shot and killed Jones as well. Coleman testified that there was never a plan to kill anyone and that Jones had been just fine after her beating. According to

Coleman, he told Golden not to worry because he would take the blame for everything. Coleman then developed a plan with Tubbs at the motel to "get rid of all the evidence."

¶28. The jury was not convinced and convicted Tubbs and Coleman on all counts. The trial judge sentenced Tubbs to serve a term of life imprisonment as to the two counts of first degree murder, to run consecutively. In addition, the trial judge sentenced Tubbs to a term of three years as to the two counts of desecration of a human corpse, to run concurrently with her two life sentences. Tubbs moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied her motion.

## DISCUSSION

**I.      Whether the evidence was sufficient to convict Tubbs of two counts of first degree murder.**

¶29. The Court reviews whether the evidence is sufficient to sustain a conviction de novo. **Green v. State**, 269 So. 3d 75, 79 (Miss. 2018) (citing **Brooks v. State**, 203 So. 3d 1134, 1137 (Miss. 2016)). In reviewing whether the evidence is sufficient to sustain a verdict, we view the evidence in the light most favorable to the prosecution. **Swanagan v. State**, 229 So. 3d 698, 703 (Miss. 2017) (quoting **Fagan v. State**, 171 So. 3d 496, 503 (Miss. 2015)). In doing so, we determine whether the evidence presented was sufficient for a rational juror to find each essential element of the crime beyond a reasonable doubt. **Id.** (quoting **Fagan**, 171 So. 3d at 503).

¶30. Under Mississippi Code Section 97-3-19(1)(a) (Supp. 2019), "[t]he killing of a human being without the authority of law by any means or in any manner shall be murder . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human

10

being, shall be first-degree murder . . . ." Miss. Code Ann. § 97-3-19(1)(a) (Supp. 2019). It is a longstanding principle that "[o]ne who acts with others in the commission of a crime and aids and abets is responsible as a principal in the offense." *Wells v. State*, 849 So. 2d 1231, 1239 (Miss. 2003) (citing *Bass v. State*, 231 So. 2d 495, 496 (Miss. 1970)).

¶31.    "[T]o aid and abet in the commission of a felony, one must 'do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime.'" *Vaughn v. State*, 712 So. 2d 721, 724 (Miss. 1998) (internal quotation mark omitted) (quoting *Malone v. State*, 486 So. 2d 360, 363 (Miss. 1986)). This Court has held that

> "Aiding and abetting is defined to be 'the offense committed by those persons who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator'. . . . And such aiding and abetting *may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary*, though such assistance may not be called into requisition."

*Swinford v. State*, 653 So. 2d 912, 915 (Miss. 1995) (emphasis added) (alteration in original) (quoting *Wynn v. State*, 63 Miss. 260, 264 (1885)).

¶32.    Tubbs contends that the State failed to present evidence showing that she aided and abetted the murders of Jones and Polk. She argues that the plan was for Coleman to assault Jones, not to murder her. She further contends that murdering Polk was never a part of the plan. Tubbs asserts, therefore, that she "did not incite, encourage, or assist Keith Coleman in the commission of the crime."

¶33.    "[I]ntent may be proven . . . by showing the acts of the person involved at the time in question, and by showing the circumstances surrounding the incident." *Lollis v. State*, 373

So. 3d 1004, 1008 (Miss. 2023) (alterations in original) (internal quotation marks omitted) (quoting *Thompson v. State*, 258 So. 2d 448, 448 (Miss. 1972)).  Moreover, the jury is permitted to draw reasonable inferences from the evidence presented based on common sense and lived experience.  *Jones v. State*, 252 So. 3d 574, 587 (Miss. 2018) (citing *Bowser v. State*, 182 So. 3d 425, 430 (Miss. 2015)).  Viewing the evidence presented in this case in the light most favorable to the State, the jury could have reasonably found based on common sense and lived experience that Tubbs's unwavering participation before, during, and after the murders of Jones and Polk evinced her intent to aid and abet Coleman in the commission of the crimes.

¶34.   Coleman would not have had the opportunity to murder the two victims in the field without Tubbs performing her role in the plan.  Evidence was presented that Tubbs assisted Coleman in planning an ambush of Jones.  Evidence was presented that Tubbs was upset at Jones for allegedly sleeping with her former boyfriend and for allegedly "snitching" to the police on an unrelated matter.  Evidence was presented that Tubbs knew Jones could die during the ambush but that she did not care.  Evidence was presented that Jones was afraid of Coleman and that Tubbs deceived Jones by hand delivering her to Coleman under the guise of going to Taco Bell.

¶35.   Evidence was presented that Tubbs did not alter the plan once Polk agreed to accompany Jones.  Evidence was presented that Tubbs alerted Coleman that Polk was with them on the way to the ambush site.  Evidence was presented that Tubbs was in constant

12

contact with Coleman via text message for the duration of her pre-planned back road route as not to alert the two victims of danger.

¶36. Evidence was presented that Tubbs drove into the field, parked next to the decoy vehicle, and pretended to get out to help Golden. Evidence was presented that, after Coleman began beating Jones with his pistol, Tubbs retrieved a .22 caliber rifle that Coleman had brought in the decoy vehicle. Evidence was presented that Tubbs cocked that rifle and handed it to Golden, instructing her to hold it on Polk in case he tried to help Jones.

¶37. Evidence was presented that Tubbs rendezvoused with Coleman at the Crowder house after the murders and went with him to hide out at the motel thereafter. Evidence was presented that Tubbs accompanied Coleman to Walmart where the two purchased several items to use in disposing of the deceased bodies. Evidence was presented that Tubbs participated in dismembering the victims, burning the rest of their bodies, and disposing of any remaining evidence at the scene. Evidence was presented revealing that Tubbs admitted to laughing and having fun when she cut off Jones's head.

¶38. The record in the case sub judice, therefore, viewed in the light most favorable to the State, demonstrates that sufficient evidence was presented to sustain Tubbs's two convictions of first degree murder. Despite Tubbs's contention that she only believed that she was taking Jones to a beating and that Polk was merely collateral damage to that goal, a reasonable juror could have found based on common sense and lived experience that Tubbs's unwavering participation before, during, and after the deaths of Jones and Polk revealed her intent to aid and abet Coleman in their murders beyond a reasonable doubt.

**II.    Whether the trial court committed plain error by failing to exclude Clinton's testimony as to Tubbs's confession as inadmissible hearsay.**

¶39.    Tubbs contends that Clinton's testimony as to her confession was inadmissible hearsay. The objection that Tubbs contends preserved her claim of error on appeal was to a specific question asked by the prosecutor during Clinton's redirect examination that Tubbs argued went outside the scope of the cross-examination. The trial court sustained that objection. Tubbs, however, never objected to any portion of Clinton's testimony regarding her confession as inadmissible hearsay.

¶40.    "It is well established that objections must be made with specificity to preserve for appeal." *Scott v. State*, 796 So. 2d 959, 964 (Miss. 2001) (citing *Oates v. State*, 421 So. 2d 1025, 1030 (Miss. 1982)). "A trial judge cannot be put in error on a matter which was not presented to him for decision." *Holmes v. State*, 798 So. 2d 533, 537 (Miss. 2001) (citing *Ponder v. State*, 335 So. 2d 885, 886 (Miss. 1976)). Accordingly, Tubbs has waived the issue and is procedurally barred from raising it on appeal.

¶41.    Notwithstanding the procedural bar, we will consider the merits of Tubbs's contention under the plain error doctrine in light of the gravity of the charges. *See Ross v. State*, 954 So. 2d 968, 992 (Miss. 2007) (citing *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005)). "For the plain-error doctrine to apply, there must have been 'an error that resulted in a manifest miscarriage of justice or "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."'" *Hall v. State*, 201 So. 3d 424, 428 (Miss. 2016) (alteration in original) (quoting *Brown v. State*, 995 So. 2d 698, 703 (Miss. 2008)). "To

14

determine if plain error has occurred, this Court must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether that error has prejudiced the outcome of the trial.'" *Conner v. State*, 138 So. 3d 143, 151 (Miss. 2014) (alteration in original) (internal quotation marks omitted) (quoting *Grayer v. State*, 120 So. 3d 964, 969 (Miss. 2013)).

¶42.    Under Mississippi Rule of Evidence 801(d)(2)(A), a statement that is offered against an opposing party and was made by the party in an individual or representative capacity is not hearsay. Miss. R. Evid. 801(d)(2)(A). "Thus, statements made by a defendant to a witness are admissible when offered by the State against the criminal defendant, because they are not hearsay." *Jackson v. State*, 245 So. 3d 433, 442 (Miss. 2018) (citing Miss. R. Evid. 801(d)(2)(A)).

¶43.    In the case sub judice, Tubbs made her confession to Clinton, and he testified to her confession at trial. Accordingly, under Rule 801(d)(2)(A) of the Mississippi Rules of Evidence, the trial judge did not commit plain error by failing to exclude Clinton's testimony as to Tubbs's confession.

¶44.    Lastly, for the first time on appeal, Tubbs contends that her "video taped interview would have been the best evidence to present in this case, not hearsay testimony of Officer Clinton that portrayed Tubbs in a bad light." Notwithstanding the procedural bar, Tubbs's contention lacks merit. Under Rule 1002 of the Mississippi Rules of Evidence, "[a]n original writing, recording, or photograph is required in order to prove its content unless otherwise provided by law." Miss. R. Evid. 1002. The best evidence rule would not operate to exclude

Clinton's testimony regarding Tubbs's video recorded interview because he participated in the interview and had firsthand knowledge of it. *See Quinn v. State*, 479 So. 2d 706, 709 (Miss. 1985). Had Tubbs wished to use the video as substantive evidence of her own or to impeach Clinton, she was free to do so. *See id.* Accordingly, the trial judge did not commit plain error by failing to apply the best evidence rule to exclude Clinton's testimony as to Tubbs's confession.

## CONCLUSION

¶45. Finding no error, we affirm.

¶46. **AFFIRMED.**

**KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**